IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-00859-SBP

DUTCH HERITAGE GARDENS INC., a Colorado corporation,

    Plaintiff,

v.

THE KROGER CO., an Ohio corporation,

    Defendant.

---

**ORDER**

---

**Susan Prose, United States Magistrate Judge**

    This matter comes before the court on Defendant The Kroger Co.'s Motion to Enforce Alternative Dispute Resolution Agreement and Stay Proceedings (ECF No. 17) ("Motion"). The parties have consented to proceed before the undersigned United States Magistrate Judge for all matters, including entry of a final judgment. ECF Nos. 29, 30. The court has carefully considered the Motion and related briefing, the entire case file, the applicable case law, and the parties' presentations at the oral argument conducted on May 29, 2025 (ECF No. 31). For the following reasons, the court now respectfully **GRANTS** the Motion.

**I.    BACKGROUND**

    **A.    Facts**

    The following facts, which are undisputed unless otherwise noted, are drawn from the parties' filings:

    Plaintiff Dutch Heritage Gardens Inc. ("DHG") is a family-run Colorado corporation

based in Larkspur, Colorado, that wholesales plants and flowers throughout Colorado and the surrounding region. Complaint, ECF No. 7 ¶¶ 2, 5. DHG operates a 20-acre greenhouse in Douglas County, where it cultivates tens of thousands of plants and flowers for shipment to retailers, including Kroger. *Id*. ¶ 5. Kroger, an Ohio corporation headquartered in Cincinnati, operates a national retail grocery chain under various names, including King Soopers, City Market, Fry's, Dillons, and Smith's. *Id*. ¶ 3. Kroger conducts business in Colorado and in all other states where DHG does business. *Id*. ¶ 3.

The parties' relationship began in 2007, when DHG began to supply plants and flowers at wholesale prices to Kroger's Denver division. *Id*. ¶ 7. Over time, the partnership expanded; by 2023, DHG was supplying five Kroger divisions spanning nine states, including King Soopers locations throughout Colorado. *Id*. ¶ 8. In the fall, DHG has historically supplied an assortment of mums in various sizes and colors to Kroger stores in Colorado and other western states. *Id*. ¶ 9. In the fall and winter seasons, DHG has provided poinsettias for sale in King Soopers and City Market stores. *Id*. ¶ 10.

        **1.**        **November 2018: Standard Vendor Agreement Signed by DHG's Office Manager**

In 2018, Kroger implemented what it describes as "a centralized vendor management system" called "Supplier Hub." April 16, 2025 Declaration of Bethany Young,[1] ECF No. 24-1 ¶ 5. All Kroger vendors were required to join Supplier Hub and to create a vendor profile as a condition of continuing to do business with the company. *Id.* ¶ 6. To initiate Supplier Hub, Kroger sent its vendors an email that included a link to instructions to complete a Supplier Hub

---

[1] Ms. Young is the Supplier Compliance Manager for Corporate Enterprise Sourcing at Kroger. Young Decl. ¶ 3.

profile, along with "a list of required documentation" and other information. *Id.* ¶ 7. Ms. Young avers that Aaron Van Wingerden, who is the president of DHG and "a vendor contact for Kroger, "would have been provided direct access to the Supplier Hub Instructions." *Id.* ¶ 10; *see also id.* ¶ 10 (verifying that the Supplier Hub instructions attached to Ms. Young's declaration "are the same or substantially the same as those provided to Kroger vendors in 2018"); *see also* ECF No. 24-1 at 7-15 (document entitled "Supplier Integrity: Supplier Hub Training; Vendor: Legal Terms and Conditions").

As part of Kroger's initiation of Supplier Hub, participating vendors were given access to "legal terms and conditions" governing the relationship between Kroger and the vendor. ECF No. 24-1 at 17 (stating that "[t]he Legal Terms and Conditions screen displays several legal documents that must be agreed to before submitting your company profile"). The vendor was instructed (1) to print or download the legal documents to enable it to review them with an attorney before signing and (2) to ensure that an authorized representative signed the agreements:

> **Before signing the agreements,** print or download the documents to review with your legal department. (**Click here** to go to the **Print Legal Documents** section of this guide.) Once the legal department has reviewed them, confirm with them that you are authorized to sign them on behalf of the organization.
>
> **If you are NOT authorized to sign an agreement,** you can add the appropriate person to your organization's Supplier Hub profile on the **Organization Contacts** screen. That individual should then access the Supplier Hub and digitally sign the necessary documents. (For details on adding Organization Contacts, **click here** to access the **Supplier Hub Help Page** then access the **Organization Contacts** help document.)

*Id.*; *see also* Young Decl. ¶¶ 13-15.

Katlyn Scholato, who represented herself as the "Office Manager" of DHG, completed the Supplier Hub vendor profile on behalf of DHG sometime in 2018. Young Decl. ¶ 19. After that, on November 28, 2018, Ms. Scholato signed and submitted a "Standard Vendor Agreement," or "SVA," on behalf of DHG. ECF No. 17-1 at 11 (signature block denoting Ms. Scholato as "Office Manager" for DHG); *see also* Young Decl. ¶ 20. However, Mr. Van Wingerden states that Ms. Scholato, whom he describes as an "office secretary for DHG," did

not obtain the required permission to sign the SVA and was therefore not authorized to execute that document on behalf of the company—a contention this court accepts as true for purposes of evaluating the Motion. Declaration of Aaron Van Wingerden, ECF No. 21-1 ¶¶ 7, 10, 12[2]; *see also* ECF No. 21-3 at 21 (stating, in DHG's "Employee Confidentiality Agreement," that "[e]xpress written permission must be given before any documents may be signed on the company's behalf").

Turning to the SVA executed by Ms. Scholato, the agreement by its terms "governs Kroger's purchases of Products from the Vendor. Products means all goods provided to Kroger. Purchase Orders shall not be deemed to waive or modify the terms and conditions contained herein and any modification of this Agreement requires an express, written agreement signed by both parties." *See* SVA § 1; *see also* Declaration of Adam Speaks,[3] ECF No. 17-1 ¶ 7 (describing the SVA as "govern[ing] Kroger's purchases of products from DHG made by purchase orders"). As pertinent here, the SVA contains a provision requiring the use of mediation—which, if unsuccessful, must be followed binding arbitration—to resolve all disputes between the parties:

> a. Any disagreement, dispute, controversy or claim with respect to the validity of this Agreement or arising out of or in relation to this Agreement or a Kroger Purchase Order or any agreement in which either is incorporated, or breach hereof, shall be governed by the substantive laws of the State of Ohio, without regard to conflicts-of-law rules, and shall be finally settled by arbitration in Cincinnati, Hamilton County, Ohio, USA or other location agreed upon by Kroger, in accordance with articles of the American Arbitration Association for Commercial Arbitration, or such other commercial arbitration process as may be mutually agreed upon by the

---

[2] Mr. Van Wingerden's wife, Rozalia Van Wingerden, the vice president of DHG, submits a declaration in which she attests to substantially the same points as her husband. *See* ECF No. 21-2.

[3] Mr. Speaks is the Director of Floral Merchandising for Kroger. Speaks Decl. ¶ 3.

        parties.

        . . .

b.    Neither party will commence an arbitration proceeding pursuant to this provision unless that party first gives a written notice (a ''Dispute Notice'') to the other party setting forth the nature of the dispute. The parties agree to try in good faith to settle the dispute 1) first through discussions between the parties' management and then 2) non-binding mediation conducted by a mediator mutually agreeable to the parties before resorting to arbitration. If the parties cannot agree on a mediator within forty-five (45) days of the Dispute Notice, mediation shall be conducted pursuant to the AAA commercial mediation procedures. Failure to submit the Dispute Notice shall be grounds to dismiss any arbitration filed by either party. The parties agree to mediate within sixty 60 days of the Dispute Notice, unless extended by mutual agreement of the parties. The mediation shall be conducted in Cincinnati, Hamilton County, Ohio, USA or other location agreed upon by Kroger. The parties agree to exchange any relevant, nonprivileged documents that support their claims or defenses not later than two weeks before the scheduled mediation. The mediator's fees will [be] paid equally by the parties and each party shall bear its own attorney's fees and expenses.

c.    If the Dispute has not been resolved as provided above, or otherwise resolved, within ninety (90) days after receipt of the Dispute Notice, or any mutually agreed upon extension, then the Dispute will be determined by binding arbitration. All arbitrations will be conducted in accordance with such rules as may be agreed upon by the parties, or failing agreement within thirty (30) days after arbitration is demanded, in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

ECF No. 17-1 at 7-8 (SVA § 7); *see also* Speaks Decl. ¶ 6. For simplicity, the court will refer to § 7 of the SVA as the "Arbitration Provision."

    Kroger does not consider a vendor profile in Supplier Hub to be complete until the vendor has signed all applicable documents on the legal information page of the vendor's profile. Young Decl. ¶ 32. Since November 28, 2018—when Ms. Scholato signed the SVA on behalf of DHG—Kroger has viewed DHG as having "a completed profile that was in Vendor Profile

5

Approved Status." *Id.* ¶ 33. Had that not been the case, Kroger would not have continued to do business with DHG. *Id.* ¶ 34 (stating that "Kroger would not have conducted business with DHG if the SVA was not in effect").

### 2. June 2021: The "Ship to Home Addendum" to the SVA Signed by DHG's President

Sometime after Supplier Hub was implemented, Kroger decided that it would require certain vendors, including DHG, to execute an addendum to the SVA. Young Decl. ¶ 25. This "Ship to Home Addendum" ("Addendum") altered and supplemented certain terms and conditions in the SVA. *Id.*; *see also* ECF No. 24-1 at 23 (stating that "[t]his Ship to Home Addendum to the Standard Vendor Agreement . . . amends and supplements the terms and conditions of the Agreement for Products").

Mr. Van Wingerden's name appears for the first time in connection with DHG's dealings with Kroger via Supplier Hub on June 17, 2021, when he signs the Addendum on behalf of DHG. ECF No. 24-1 at 25. Kroger explains that the Addendum cannot be viewed by a Supplier Hub user without the user also viewing—or having the immediate ability to view—the original SVA to which it relates:

> When a user navigates to the Legal Information page to sign the Ship to Home Addendum, that user would see the version of the SVA that was signed by its organization and who it was signed by. The user can also scroll up and down to review the entire SVA. The Ship to Home Addendum would not populate for signature if the vendor was not subject to the SVA.

Young Decl. ¶ 27; *see also* ECF No. 24-1 at 27 (screenshot of DHG Supplier Hub profile legal information page showing the Ship to Home Addendum, with a prompt for the vendor's signature, displayed directly underneath the Standard Vendor Agreement). Accordingly, when

Mr. Van Wingerden used his "unique user access credentials" to access and sign the Addendum on June 17, 2021, the SVA—with Ms. Scholato's signature—would have been displayed immediately above the Addendum where he placed his signature. Young Decl. ¶¶ 29, 31.

### B. Procedural History of the Litigation and the Instant Motion

The relationship between DHG and Kroger went awry in 2024. In that year, according to DHG, it grew large quantities of mums and poinsettias at the behest of Kroger, which Kroger then refused to accept or pay for at the agreed-upon price. *See generally* ECF No. 7 ¶¶ 11-40. Kroger's alleged conduct was the impetus for this lawsuit, which DHG originally brought in a Colorado state court on February 11, 2025. *See id.* at 2; *id.* ¶¶ 41–61 (raising claims for breach of contract, promissory estoppel, and unjust enrichment).

Kroger removed the action to this court on March 17, 2025, invoking federal jurisdiction on the basis of diversity of citizenship under 28 U.S.C. § 1332. ECF No. 1. A week later, on March 24, 2025, Kroger filed the instant Motion seeking to enforce the Arbitration Provision. ECF No. 17. From Kroger's perspective, the issue is straightforward: DHG contractually obligated itself to abide by the SVA and, with it, the Arbitration Provision—the language of which is unambiguous and all-encompassing, covering "[a]ny disagreement, dispute, controversy or claim with respect to the validity of this Agreement or a Kroger Purchase Order or any agreement in which either is incorporated, or breach hereof . . ." ECF No. 17 at 6 (discussing SVA § 7(a)). The Arbitration Provision, Kroger argues, is enforceable under both federal and Ohio law, the latter of which governs disputes under the SVA. *Id.* at 7-13; *see also* SVA § 7(a).

In the Motion, Kroger attempts to defuse any potential contract defense—including fraud, duress, or unconscionability—by claiming that DHG does not "allege the SVA was executed as a

7

result of fraud or duress" and that it "has similarly failed to allege the terms of the SVA are void, unconscionable, or otherwise unenforceable. In fact, to the contrary, Plaintiff seeks to enforce the terms of the SVA by asserting a breach of contract claim against Kroger." ECF No. 17 at 13 (citing ECF No. 7 ¶¶ 41-48).[4]

DHG sees the matter differently. It rejects Kroger's contention that the SVA is a valid and enforceable agreement because Ms. Scholato lacked actual authority to execute that document on behalf of DHG. ECF No. 21 at 1, 5-7. DHG argues that the court must similarly find that implied authority is lacking "because Kroger has not come forward with any facts permitting Kroger "to *reasonably* believe" that Ms. Scholato had authority to bind DHG to the SVA and all of its terms, including the Arbitration Provision. ECF No. 21 at 6-7 (emphasis in original). In short, DHG urges the court to find that it has viable defenses that render the SVA invalid as a matter of law.

## II.   ANALYSIS

The court respectfully finds that the undisputed material facts in the record establish the existence of an enforceable agreement to arbitrate. The court therefore will enforce the Arbitration Provision and administratively close this action pending completion of the arbitration process required under the SVA.

---

[4] In its complaint, DHG does not specifically mention the SVA, but it does assert that "DHG and Kroger entered into an agreement under which DHG would grow and ship a specific quantity of Mums, baskets, pots, and Poinsettias for the Fall 2024 and Winter 2024," ECF No. 7 ¶ 42—presumably pursuant to the SVA, which "governs Kroger's purchases of Products from the Vendor." SVA § 1.

### A. Legal Principles

The Federal Arbitration Act ("FAA") provides that contractual agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 of the FAA obligates courts to stay litigation on matters that the parties have agreed to arbitrate "providing the applicant for the stay is not in default in proceeding with such arbitration." *Id.* § 3. Section 4 authorizes a federal district court to compel arbitration for a dispute over which it would have jurisdiction. *See id*. § 4. Because the FAA establishes "a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), courts "must interpret arbitration clauses liberally, and all doubts must be resolved in favor of arbitration." *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 798 (10th Cir. 1995) (citing *Moses H. Cone*, 460 U.S. at 24-25).

However, "arbitration is a matter of contract," and the court cannot require a party "to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quotation omitted); *accord Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 832 (10th Cir. 2023). Indeed, "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997) (citation omitted). And "[u]nlike the general presumption that a particular issue is arbitrable when the existence of an arbitration agreement is not in dispute, when the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1370 (D. Colo. 2014) (quoting *Riley Mfg. Co. v.*

9

*Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998)), *aff'd*, 811 F.3d 371 (10th Cir. 2016); *see also Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002) (stating that the "presumption [of arbitrability] disappears when the parties dispute the existence of a valid arbitration agreement").

Where, as here, there is a dispute concerning the existence of an agreement to arbitrate, the court resolves a motion to compel arbitration under a framework "similar to summary judgment practice." *Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012). Under this framework, the movant bears the "initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement." *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014) (citing *Hancock*, 701 F.3d at 1261). If the movant meets its initial burden, "the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement." *Id.* In undertaking this analysis, the court gives the non-movant "the benefit of all reasonable doubts and inferences that may arise." *Hancock*, 701 F.3d at 1261 (citation omitted). If there are "no genuine issues of material fact regarding the parties' agreement," the court may find that an agreement to arbitrate exists and grant the motion to compel arbitration. *Id.*

      **B.**    **Existence of an Agreement to Arbitrate**

DHG argues that there is no valid and enforceable arbitration agreement because Ms. Scholato lacked either actual or apparent authority to bind DHG to the SVA and, by extension, the Arbitration Provision. The facts here, viewed in the light most favorable to DHG, compel this court to conclude that the SVA must be enforced and the parties required to follow the alternative dispute resolution process, including arbitration, set forth in that contract.

Courts generally apply "'state-law principles that govern the formation of contracts' to determine whether a party has agreed to arbitrate a dispute." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see also, e.g.*, *Nesbitt*, 74 F. Supp. 3d at 1371 ("A federal court must apply state contract law principles when determining whether an arbitration agreement is valid and enforceable.") (citation omitted); *Reeves v. Enter. Prod. Partners, LP*, 17 F.4th 1008, 1011 (10th Cir. 2021) ("The scope of the arbitration agreement . . . is a question of state contract law.") (citation omitted). Here, the parties do not dispute that Colorado law should control the contract formation analysis. ECF No. 24 at 1, 34 (Kroger citing Colorado law on actual and implied authority); ECF No. 21 at 6 (same for DHG). This court therefore will evaluate the question of whether an agreement to arbitrate exists pursuant to Colorado contract law.

Colorado has adopted the common law of agency, which "attributes the legal consequences of one person's action to another person on three distinct bases," two of which DHG asserts are lacking here: apparent authority and actual authority. *State Farm Mut. Auto. Ins. Co. v. Johnson*, 396 P.3d 651, 655 (Colo. 2017) (citing Restatement (Third) of Agency ch. 2 Introductory Note (Am. Law Inst. 2006); *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994) ("An agent can make his principal responsible for his actions if he is acting pursuant to either actual or apparent authority, regardless of whether the principal has knowledge of the agent's conduct.")). However, Kroger does not argue that Ms. Scholato had actual authority to execute the SVA on behalf of DHG, *see generally* ECF No. 24, and so the court proceeds to consider whether the undisputed facts demonstrate whether Ms. Scholato had apparent authority to bind her employer to the SVA, including its Arbitration Provision.

11

"An agent has apparent authority to affect a principal's relations with a third party when the third party reasonably believes, based on the principal's manifestations, that the agent has authority to act on behalf of the principal." *Johnson*, 396 P.3d at 656. "Apparent authority thus 'flows only from the acts and conduct of the principal.'" *Id.* at 656 (quoting *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1095 (Utah 1988)). Here, the undisputed facts, viewed in the light most favorable to DHG, demonstrate that that Ms. Scholato had authority to act on DHG's behalf.

Kroger implemented the Supplier Hub centralized vendor management system in 2018 and sent all of its vendors, including DHG, instructions for accessing and utilizing that system. Young Decl. ¶¶ 5, 8. Vendors did not have a choice to opt out of this system; if they wanted to do business with Kroger, they were "required to join Supplier Hub and create a vendor profile to continue doing business with Kroger." *Id.* ¶ 6. Kroger has presented evidence demonstrating that Mr. Van Wingerden, in his role as president of DHG and as a vendor contact for Kroger, would have been provided direct access to the instructions for Supplier Hub at the outset, *id.* ¶ 10, and, indeed, Mr. Van Wingerden does not dispute that point or any other of Kroger's factual representations concerning Supplier Hub. Yet, it was not Mr. Van Wingerden who created a Supplier Hub profile on behalf of DHG upon its initiation in 2018, but rather Ms. Scholato, and it was Ms. Scholato who signed the SVA on November 28, 2018. *Id.* ¶ 20. Had no representative of DHG signed the SVA in 2018, DHG's business relationship with Kroger would have ceased. *Id.* ¶ 33.

The uncontroverted factual record further shows that for two-and-half years—between November 2018 and June 2021 when Mr. Van Wingerden finally obtained his own Supplier Hub

user access credentials and was added as a vendor contact for DHG[5] —Ms. Scholato was the only DHG official designated to use the mandatory Supplier Hub system and, thus, DHG's sole point of contact with Kroger for purposes of that system. Neither party has presented evidence showing that anyone else from DHG was using (or sought approval to use) Supplier Hub during those many months, compelling the court to conclude that, but for Ms. Scholato's contact with Kroger via Supplier Hub, DHG's vendor relationship with Kroger would have been terminated. And throughout that entire period, and apparently long after, no one from DHG informed Kroger that Ms. Scholato lacked authority to act on its behalf, that Kroger should disregard any actions Ms. Scholato had taken, or that Kroger should cease communications with Ms. Scholato and make Mr. Van Wingerden (or another DHG official) their point of contact for purposes of the Supplier Hub system.

These facts support Kroger's reasonable belief that Ms. Scholato had authority to act on behalf of DHG. *See Johnson*, 396 P.3d at 656. And the reasonableness of Kroger's belief is reinforced by undisputed evidence concerning the conduct of Mr. Van Wingerden himself.

Mr. Van Wingerden received "direct access to the Supplier Hub Instructions" at the time the system was implemented in 2018, and those instructions advised the vendor of the requirement that it must execute the version of the SVA (with its Arbitration Provision) that Ms.

---

[5] The court cannot help but wonder how it was that Mr. Van Wingerden, as president of DHG—or his wife, as vice president of the company—would not have examined the operative documents governing its extremely significant contractual relationship with Kroger at any point during the 31-month period when only Ms. Scholato possessed Supplier Hub credentials. However, the Van Wingerdens' motivation in that regard is not pertinent to the analysis of Ms. Scholato's apparent authority to act on behalf of DHG, which the undisputed factual record leaves the court no reason to question.

Scholato signed for DHG in November 2018 and incorporated a "Legal Terms and Conditions" section "which provided that agreements were to be signed *by someone with authority* for the organization." *See id.* at 10-14 (emphasis added); *see also* ECF No. 24-2 (directing that only an "authorized" person should sign the required agreements for Supplier Hub, including the SVA, and that prior to signing the vendor should "print or download the documents to review with your legal department"). Notwithstanding these explicit instructions, Mr. Van Wingerden never communicated to Kroger that Ms. Scholato lacked authority to act in this "authorized" capacity. *Id.* ¶ 21. Nor, apparently, did he avail himself of the opportunity to examine the mandatory version of the SVA that Ms. Scholato ultimately signed and that allowed DHG to continue to do business with Kroger. Put another way, Mr. Van Wingerden's silence in the face of these unequivocal communications from Kroger were "manifestations" of DHG's approval of Ms. Scholato's authority to act for her employer. *See Johnson*, 396 P.3d at 656; Restatement (Third) of Agency § 2.03.

The undisputed facts thus evince no evidence that would prompt a reasonable observer to question Ms. Scholato's authority to act on behalf of DHG. She was the official who completed DHG's Supplier Hub profile—a foundational step in establishing the company's vendor status— and digitally executed the SVA using DHG's official Supplier Hub user account. Young Decl. ¶¶ 19-20. The use of these credentials, which required internal authorization to access, reasonably signaled to Kroger that Ms. Scholato's actions were endorsed by DHG. And Supplier Hub's design further supports Kroger's understanding of Ms. Scholato's authority: all vendor legal documents, including the signatory's identity, are maintained on the platform and prominently displayed, making them readily accessible to any DHG user with credentials. *Id*.

14

¶ 24. This accessibility ensured that DHG officials, including Mr. Van Wingerden, had the opportunity to review the executed SVA, had they chosen to take it. This fact, too, buttresses Kroger's understanding that the SVA reflected DHG's corporate assent. Additionally, because vendors control their user credentials and thus determine which of their employees has access, *see id*. ¶ 22, Ms. Scholato's use of DHG's account to execute the SVA would reasonably indicate to Kroger that her actions were sanctioned by the company's internal governance.

Moreover, DHG's actions post-dating the execution of the SVA validated Kroger's reliance on the authority of Ms. Scholato to act for her employer. On June 17, 2021, Kroger added Mr. Van Wingerden "as a DHG contact with user access credentials in Supplier Hub[.]" *Id*. ¶ 23.[6] He then used his credentials to sign in to Supplier Hub and access the Ship-to-Home Addendum to the SVA. *Id*. ¶ 29. When he did so, the Supplier Hub screen displayed the SVA executed by Ms. Scholato. *Id*. ¶¶ 26, 30 ("The Ship to Home Addendum is displayed directly the SVA on the vendor's Supplier Hub profile Legal Information page."). The Supplier Hub page showing Mr. Van Wingerden as signatory on the Addendum prominently displays, directly above that information, Ms. Scholato as the signatory on the SVA. *See* ECF No. 24-1 at 27 (screenshot of the page reflect both signatories); *see also* Young Decl. ¶ 27 ("When a user navigates to the Legal Information page to sign the Ship to Home Addendum, that user would

---

[6] Mr. Van Wingerden states that he was "[a]t all times relevant . . . Kroger's primary point of contact at DHG," Van Wingerden Decl. ¶ 16, but he provides no factual specifics to support that assertion, including the nature or timing of his contact with the company, the identities of the Kroger officials with whom he purportedly interacted, or exactly what actions he took when it came to dealing with Kroger. In light of the record as a whole—including Mr. Van Wingerden's apparent silence for years while DHG gained benefits under the SVA that Ms. Scholato signed—the court does not find this contention sufficient to create a genuine dispute concerning Ms. Scholato's authority to act for DHG.

15

see the version of the SVA that was signed by its organization and who it was signed by."). Indeed, "[t]he Ship to Home Addendum would not populate for signature if the vendor was not subject to the SVA." Young Decl. ¶ 27

No reasonable observer could conclude from these undisputed facts that Ms. Scholato lacked authority to execute the SVA on behalf of DHG. And Kroger's attestation that it would not have conducted business with DHG absent an effective SVA, Young Decl. ¶ 34, underscores that its reliance on Ms. Scholato's authority was a cornerstone of its relationship DHG. Further, the long period of DHG's accepting the benefits of having a working vendor relationship with Kroger reinforces the reasonableness of Kroger's belief in Ms. Scholato's authority. *See Bethany Nursing & Rehab Ctr., LLC v. Amaro*, No. 22-cv-03138-RM-SBP, 2024 WL 1286257, at *8 (D. Colo. Mar. 11, 2024), *report and recommendation adopted*, 2024 WL 1282347 (D. Colo. Mar. 26, 2024) (family member's execution of an arbitration agreement on behalf of her mother, followed by her mother's acquiescence in receiving care at a rehabilitation facility, raised "no genuine dispute that [the facility] would reasonably believe that the agent had authority to act on behalf of the principal in these circumstances") (cleaned up).

In sum, the undisputed facts regarding the chain of events here—Ms. Scholato appearing as the sole contact for DHG, her execution of the SVA within a credentialed system visible to DHG leadership, and Mr. Van Wingerden's confirmatory actions—show that Kroger had a reasonable basis to believe that Ms. Scholato had authority to act on behalf of DHG in executing the SVA. Kroger thus has carried its burden to demonstrate that the Arbitration Agreement is "valid, irrevocable, and enforceable," and DHG has not met its burden to raise a genuine dispute as to that conclusion. Because no grounds for revocation of the SVA exist, the alternative dispute

16

resolution process mandated in the Arbitration Provision shall proceed.[7]

### C.     Administrative Closure

Kroger seeks a stay of this case pending completion of arbitration, pointing out that § 3 of the FAA "requires courts to stay litigation of arbitral claims pending arbitration of those claims 'in accordance with the terms of the agreement[.]'" ECF No. 17 at 14 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

While Kroger has requested a stay, "[a]dministrative closure pursuant to D.C.COLO.LCivR 41.2 may be appropriate when a case would otherwise be stayed for an indefinite amount of time, subject to reopening for good cause." *Aragon v. U-Haul Co of Colorado*, 550 F. Supp. 3d 933, 935 (D. Colo. 2021) (citing *Hartford Life and Accident Ins. Co. v. Nickal*, No. 17-cv-02556-MSK-MJW, 2018 WL 1173150, at *1 (D. Colo. Mar. 6, 2018) (finding administrative closure appropriate because it was unclear when a parallel criminal proceeding would be adjudicated)). Administrative closure "is a way for the court to manage its docket by shelving pending, but dormant, cases without a final adjudication." *Id.* (cleaned up).

Given the uncertainty regarding the timeline of the multi-level alternative dispute resolution process compelled by the SVA, and the potential for arbitration to resolve all outstanding issues, administrative closure pursuant to D.C.COLO.LCivR 41.2 is appropriate. *See, e.g.*, *Santich v. VCG Holding Corp.*, No. 17-cv-00631-RM-MEH, 2020 WL 1529182, at *3

---

[7] Kroger argues that, even if Ms. Scholato did not have apparent authority, the SVA is enforceable because Mr. Van Wingerden's signature on the Addendum—which "specifically stated that it amended and supplemented the terms and conditions of the SVA"—amounts to a ratification of the SVA. *See* ECF No. 24 at 5. Because the undisputed facts confirm that Ms. Scholato did have apparent authority to execute the agreement, the court does not reach this alternative argument for enforcement of the SVA.

(D. Colo. Mar. 30, 2020), *reconsideration denied*, 2020 WL 2848143 (D. Colo. June 2, 2020) (holding that administrative closure is more appropriate than a stay pending arbitration); *Prosser v. Whayne & Sons Enter., Inc.*, No. 14-cv-01764-KLM, 2015 WL 128534, at *2 (D. Colo. Jan. 8, 2015) ("[A]lthough a stay of proceedings in this matter is warranted, the circumstances presented here make this case eminently more suited for administrative closure, given the fact that arbitration should resolve all outstanding issues."). As the United States Court of Appeals for the Tenth Circuit has recognized, "[u]se of the administrative-closure mechanism allows district courts to remove from their pending cases suits which are temporarily active elsewhere (such as before an arbitration panel) or stayed (such as where a bankruptcy is pending)." *Patterson v. Santini*, 631 F. App'x 531, 534 (10th Cir. 2015) (quotation marks and citation omitted). And demonstrating good cause to reopen an administratively-closed matter is in no way an onerous burden; indeed, "good cause to reopen a case exists where the parties wish to litigate the remaining issues that have become ripe for review." *Id.* (cleaned up).

Accordingly, this matter will be administratively closed pursuant to Local Rule 41.2, with leave to reopen for good cause shown, pending the completion of the process mandated by the Arbitration Provision of the SVA.

### III.   CONCLUSION

For the reasons stated herein, it is respectfully **ORDERED** that:

(1) Defendant The Kroger Co.'s Motion to Enforce Alternative Dispute Resolution Agreement and Stay the Proceedings (ECF No. 17) is **granted**;

(2) The case is **administratively closed** pursuant to D.C.COLO.LCivR 41.2 pending completion of the process mandated by the Arbitration Provision of the SVA, with leave to

reopen for good cause shown; and

(3) During the period of administrative closure, the parties shall **file** a joint status on or before March 12, 2026, and **every 90 days thereafter**.

DATED: December 13, 2025        BY THE COURT:

_____
Susan Prose
United States Magistrate Judge